[No. B053457. Second Dist., Div. One. May 31, 1991.]

KEVIN TISHER et al., Plaintiffs and Appellants, v.
CALIFORNIA HORSE RACING BOARD, Defendant and Respondent;
LOS ALAMITOS RACING ASSOCIATION, Real Party in Interest and
Respondent.

350

COUNSEL

Craigo & Zimmerman and Richard W. Craigo for Plaintiffs and Appellants.

Daniel E. Lungren, Attorney General, N. Eugene Hill, Assistant Attorney General, Henry G. Ullerich and Christopher C. Foley, Deputy Attorneys General, for Defendant and Respondent.

Mandel & Norwood, S. Jerome Mandel and Naomi Norwood for Real Party in Interest and Respondent.

## Opinion

### SPENCER, P. J.—

#### Introduction

Plaintiffs appeal from a judgment of the trial court denying their petition for writ of mandate, certiorari or prohibition.

#### Statement of Facts

Plaintiffs[1] hold licenses as harness racing drivers issued by defendant California Horse Racing Board (board). Real party in interest Los Alamitos Racing Association (LARA) owns and operates the Los Alamitos racetrack (Los Alamitos) and is licensed by the board to conduct harness racing meetings there during certain times of the year. In 1989 LARA set standards for harness racing drivers which had the effect of excluding plaintiffs as drivers in harness races at Los Alamitos. Plaintiffs petitioned the board to order LARA not to enforce the standards, but the board refused to do so. This action followed.

Lloyd L. Arnold (Arnold) is president, chief executive officer and 50 percent owner of LARA. He testified LARA bought Los Alamitos from the Hollywood Park Operating Company in 1989 for $71 million plus contingencies.

Previously, a company Arnold owned and operated as president had conducted harness racing meetings at Los Alamitos from 1979 through 1983. He also had owned and operated the Golden Bear Racing Association, which conducted harness racing meetings in the Sacramento area from 1976 through 1983. Neither of these two companies set standards for the drivers who could compete in the meetings.

After he got out of racing in 1983, Arnold decided that if he ran another major harness racing meeting he would set standards for the drivers who would compete. He wanted to have drivers competing who were at the racetrack every night; he felt they were "sharper" than those who drove in only one, two or three races a week. When he purchased Los Alamitos through LARA, he intended to impose such standards.

---

[1]Plaintiffs are Kevin Tisher, Matias Ruiz, Jean Aubin, Sr., Daniel De John, Richard McGonagle, Al Fenaughty, Gerald Slyzuik, H. C. MacDougall, Gabriele Bernat, George Hardie, Don Koenig, Laurence Hayward and Thomas C. Perkins.

Arnold believed harness racing had been going downhill in the last few years—there were fewer racing days, smaller attendance, and less handle (meaning the sum wagered), in that people weren't betting on the races when they attended. He wanted to upgrade the sport and move it forward. Public perception of harness racing was not as good as that of thoroughbred racing, and the public were the ones who bet on the races. He believed the public and people in the racing industry agreed with his imposition of standards and had wanted something similar for years; attendance and other figures reflected this.

When LARA opened the 1989-1990 harness racing meetings at Los Alamitos, the standards imposed were the requirements that competing drivers have driven in 150 races in 1988 and 1989 and have an 8 percent win rate in those races. Three or four weeks after opening, the standards were reduced to one hundred thirty drives and 8 percent wins; for those who fell short of either standard, an alternative was sixty-five starts and a .250 UDRS.[2] An exception was made by way of concession for the sires stakes races. In Arnold's view, the standards helped to increase the handle at the meet as compared to the previous year. However, he acknowledged the handle was not greater than the handle at Los Alamitos in earlier years when no standards were imposed on the drivers, and other reasons for the increase could be better management, refurbishing of the facility and an increase in advertising. When he adopted the standards, he did not consider the sex, race or religion of the persons who might be employed as drivers.

At the time of the hearing before the board, LARA was operating a harness racing meeting from November 11, 1989, through April 14, 1990; at 107 days, it was the longest meeting in years. No other harness racing was taking place in California at that time; the closest harness racing at that time in the United States was in Chicago or St. Louis, and there also was harness racing in Canada. Arnold did not consider LARA had been given a monopoly by the board; LARA just applied to the board for those dates and was given them. The next harness racing meetings in California were to be in Sacramento from April 26, 1990, through August 11, 1990; if Arnold applied for those dates he was unsure whether he would restrict the drivers at the meetings. After that, from August 21, 1990, through October 20, 1990, there was to be harness racing at Los Alamitos again; Arnold intended to apply for those dates and impose restrictions on the drivers if the application were granted.

Arnold estimated that before the standards were imposed, 60 drivers participated in a harness racing meeting. After the imposition of the standards, only 45 participated.

---

[2]UDRS stands for universal driver's rating, and it is a "batting average" reflecting a driver's first, second and third place finishes.

Arnold knew of no other racetracks which imposed similar standards on drivers. He knew of other racetracks which set some standards for drivers, but he did not know of any standards which resulted in the exclusion of more than a few drivers.

Plaintiff Kevin Tisher (Tisher) has been licensed by the board as a standardbred driver since 1953 and has won well over $1 million in purses in his career as a driver. However, he did not drive in 1987 and 1988; he pursued other interests and drove in one race per year to keep his license intact. He did not meet the standards imposed by LARA and was therefore prohibited from driving at Los Alamitos during the 1989 through 1990 harness racing meetings except in the sires stakes, where an owner or trainer who also was a licensed driver but did not meet the standards could race. He owned five racehorses which were stabled at Los Alamitos at that time.

Tisher had five drives in 1988, won $2,074 in purses and had a UDRS of .067. He had 13 drives in 1989, won $2,820 in purses and had a UDRS of .120. He was licensed in Iowa and Illinois, and two of his drives were from outside California. He drove outside California while harness racing was going on in the state; he also had horses he owned race outside California while harness racing was going on in the state.

Tisher was not aware of any other racetracks having similar restrictions to Los Alamitos. He noted since the imposition of the standards some drivers had gone elsewhere to race.

Plaintiff Harold MacDougall (MacDougall) was licensed by the board as an owner, trainer and driver; he also was licensed to drive in Michigan and Ohio. Prior to the 1989-1990 harness racing meetings at Los Alamitos, he was at Hazel Park in Detroit, Michigan, to participate in harness racing meetings as an owner, trainer and driver. He drove his own horse about 16 times and was a catch driver for others 14 or 15 times. In the last two years, he had one hundred eighteen drives, 6 percent wins, and a UDRS of .130; he won $23,387 in purses and earned driver's fees of $1,169. During that time, harness racing was his sole vocation; however, he lived on his purses, not driver's fees. In 1989 he drove at Hazel Park and in Toledo, Ohio while there was harness racing in California.

Plaintiff Matias Ruiz (Ruiz) had been licensed by the board as a trainer and driver for five years. In 1988 he had 92 drives and in 1989 he had 41 drives, for a total of 133 drives. However, he won only five races in the two years for a 4 percent win rate and a UDRS of .104. He won $17,269 in purses and received a driver's fee of $863. He got paid for training horses and received a percentage of their winnings. The reason his win rate was so

low was that, besides driving horses he had trained, he drove other horses which no one else wanted to drive because they were inexperienced or troublesome.

Of the 13 plaintiffs, only 2—Ruiz and Gabriele Bernat (Bernat)—had at least 130 drives in 1988 and 1989, but both had win rates below 8 percent and neither had a .250 UDRS. Only four—Al Fenaughty, George Hardie, Richard McGonagle and Thomas C. Perkins (Perkins)—had win rates of 8 percent or better, but none of these had more than forty-seven drives. Only one of the thirteen had a UDRS of at least .250—Perkins. Three plaintiffs earned slightly more than $1,000 each in driver's fees for the two years— Bernat, Perkins and MacDougall; Ruiz earned $863, and the others earned from $49 to $430. Bernat, Perkins, MacDougall and Ruiz each earned between $17,000 and $28,000 in purses from their drives; the others earned from $975 to $8,605.

The 13 plaintiffs averaged for the 2 years 61 drives, a 7 percent win rate, $9,958 in purses won, and driver's fees of $498. By contrast, 34 drivers who met LARA's standards averaged 813 drives, a 13 percent win rate, $499,862 in purses won, and $24,993 in driver's fees.

CONTENTIONS

I

Plaintiffs contend Business and Professions Code section 19512 precludes LARA's actions.

II

Plaintiffs further contend, even absent the clear statutory prohibition, California's common law would preclude LARA's actions.

DISCUSSION

I

█ Plaintiffs contend Business and Professions Code section 19512 precludes LARA's actions. We disagree.

Business and Professions Code section 19512 provides: "An original license issued under this article shall be issued for a period of the calendar year in which it is issued, and shall be renewable for a period, not to exceed

three years, which the [California Horse Racing B]oard may by regulation establish. The board may establish a license fee schedule consistent with the different period for which such licenses may be granted. The license shall be valid at all horseracing meetings in this state during the period for which it is issued, unless it is suspended or revoked prior to the expiration of such period." The code also provides only the board may suspend or revoke the license. (*Id.*, §§ 19440, subd. (4), 19461-19463.)

Plaintiffs contend LARA "invalidated" their licenses by imposing restrictions on who could drive at their harness racing meetings, which disqualified plaintiffs from driving at the meetings. LARA's actions in imposing the restrictions were illegal, in that section 19512 provided their licenses would be valid at all horse racing meetings in the state, and only the board has the power to "invalidate" their licenses.

However, the Business and Professions Code also provides licenses "[a]re subject to all rules, regulations, and conditions from time to time prescribed by the board." (§ 19460, subd. (b).) One of these regulations is that a racing association "may impose conditions for its race meeting as it may deem necessary." (Cal. Code Regs., tit. 4, § 1437.) Another is that "[p]ossession of a license does not, as such, confer any right upon the holder thereof to employment at or participation in a race meeting." (*Id.*, tit. 4, § 1485(c).) In other words, LARA has the right to impose conditions on the drivers in its race meetings and plaintiffs have no absolute right to participate in those race meetings by virtue of the valid licenses they possess. This being the case, the conditions imposed by LARA do not "invalidate" plaintiffs' licenses, depriving plaintiffs of a right conferred by Business and Professions Code section 19512. LARA's actions were not illegal; they were not violative of section 19512 and they did not infringe on the board's sole power to suspend or revoke plaintiffs' licenses.

## II

Plaintiffs further contend, even absent the clear statutory prohibition, California's common law would preclude LARA's actions. Again, we disagree.

In discussing the applicability of common law, plaintiffs characterize their right to utilize their licenses as vested and fundamental, relying on *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 143, 144 [93 Cal.Rptr. 234, 481 P.2d 242]. *Bixby*, which dealt with administrative agency decisions, does not support a conclusion plaintiffs have a vested, fundamental right to utilize their licenses at Los Alamitos, a private racetrack. Plaintiffs cite no other authority to support their conclusion.

However, one case cited by them in another context supports a contrary conclusion. *Redding v. St. Francis Medical Center* (1989) 208 Cal.App.3d 98 [255 Cal.Rptr. 806] held that while doctors had a "property right" in hospital staff membership which prevented their arbitrary exclusion from the staff, it was not a vested interest which precluded the hospital from changing its procedures and going from an open staff to a closed staff, excluding all but certain staff doctors. (At pp. 105-106.) Under *Redding*, plaintiffs may have some sort of "property right" in driving at Los Alamitos, but it cannot be characterized as a vested, fundamental right.

Plaintiffs cite three Supreme Court decisions dealing with the degree of protection to be afforded vested, fundamental rights. They emphasize the fact each of these decisions dealt with a situation in which only one state license was involved, as opposed to many licenses here, suggesting even more protection should be afforded here. A fair reading of these decisions shows them to be inapposite, however, not supporting any claim of protection by plaintiffs.

Plaintiffs cite *Rosner v. Eden Township Hospital Dist.* (1962) 58 Cal.2d 592 [25 Cal.Rptr. 551, 375 P.2d 431] for the proposition a licensee's right to practice his profession fully must be protected, claiming that in the instant case plaintiffs are being prevented from practicing their professions at all. In *Rosner*, the court stated: "The refusal of access to a district hospital could, as a practical matter, have the effect of denying to a licensed doctor qualified to practice in California the right to fully exercise his profession. [Citation.] The fact that a doctor, due to criticisms made by him relating to treatment of patients or hospital practices, has been 'unable to get along with' some doctors or hospital personnel is not a sufficient ground to exclude him from the use of hospitals. Obviously physicians will not always agree as to the proper treatment for a patient or as to the proper practices in a hospital. The goal of providing high standards of medical care requires that physicians be permitted to assert their views when they feel that treatment of patients is improper or that negligent hospital practices are being followed. Considerations of harmony in the hospital must give way where the welfare of patients is involved, and a physician by making his objections known, whether or not tactfully done, should not be required to risk his right to practice medicine. [¶] Moreover, a hospital district should not be permitted to adopt standards for the exclusion of doctors from the use of its hospital which are so vague and ambiguous as to provide a substantial danger of arbitrary discrimination in their application." (At p. 598.)

In *Rosner*, the right to practice one's profession fully was protected from unreasonable and arbitrary interference, not from any interference. The court had no objection to standards for exclusion of doctors "having . . . rele-

vance to fitness." (*Rosner* v. *Eden Township Hospital Dist.*, *supra*, 58 Cal.2d at p. 598.) The standards for exclusion adopted by LARA are claimed to be relevant to fitness, among other things.

Plaintiffs cite *Pinsker* v. *Pacific Coast Soc. of Orthodontists* (1969) 1 Cal.3d 160 [81 Cal.Rptr. 623, 460 P.2d 495] as an example of the Supreme Court protecting an individual's maximum potential for achievement through a license, as opposed to the instant case where plaintiffs have lost all potential for achievement through their licenses. In *Pinsker*, the question was whether an orthodontist could, "by showing that exclusion from membership in [professional associations] deprive[d] him of substantial economic advantages, establish a right to judicial intervention with respect to the denial of his application for membership." (At pp. 164-165, italics omitted.) The court held the orthodontist could. Professional associations which exercise " 'virtually monopolistic control' " in their fields, in which membership is economically advantageous, have a fiduciary responsibility with respect to acceptance or rejection of applications for membership, and an applicant "has a judicially enforceable right to have his application considered in a manner comporting with the fundamentals of due process, including the showing of cause for rejection." (*Id.* at pp. 165-166.) The licensee was not given a right to membership in an association which exercised " 'virtually monopolistic control' " in its field and in which membership was necessary to "realize maximum potential achievement and recognition"; he was given only the right to fairness in the application procedure.

*Willis* v. *Santa Ana etc. Hospital Assn.* (1962) 58 Cal.2d 806 [26 Cal.Rptr. 640, 376 P.2d 568] is cited by plaintiffs for its balancing test. *Willis* noted: "There is an established principle at common law that an action will lie where the right to pursue a lawful business, calling, trade, or occupation is intentionally interfered with either by unlawful means or by means otherwise lawful when there is a lack of sufficient justification. [Citations.] Whether there is justification is determined not by applying precise standards but by balancing, in the light of all the circumstances, the respective importance to society and the parties of protecting the activities interfered with on the one hand and permitting the interference on the other. [Citations.]" (At p. 810.) The court then held a cause of action was stated under the foregoing principles where it was alleged "that a physician of the highest qualifications is denied access to necessary hospital facilities as the result of a conspiracy designed to restrain competition and deprive him of his practice in order to benefit competing members of the conspiracy." (*Ibid.*) Once again, the exclusion of the licensee from facilities was not based on qualifications. It was without "sufficient justification," i.e., unreasonable or arbitrary.

Plaintiffs claim that *Willis's* balancing test must be applied here and, on balance, the importance to society of LARA's actions cannot "justify or *balance* the massive interference with the rights of numerous persons to pursue their chosen licensed professions and with the rights of third parties to freely contract for their services." They note a series of appellate court decisions allowing hospitals to use "closed staffs," in which *Willis's* balancing test was applied, discussing the factors which were balanced against the interference with plaintiffs' rights to fully practice their licensed profession. They conclude "the interference allowed was so minimal that it bears absolutely no resemblance to the instant situation where the competence of licensed persons is being questioned, where there is a complete monopoly situation resulting not in minimal interference but in complete interference, where no important interests of society are being served which might offset the massive deprivations inflicted on the [plaintiffs] and others."

The "closed staff" cases point out that a rulemaking or policymaking decision by a private organization which is to apply in future cases is essentially a legislative-type one, and it is reviewed differently than an adjudicative-type decision, one which applies the rule or policy to a specific individual or set of facts. (*Mateo-Woodburn* v. *Fresno Community Hospital & Medical Center* (1990) 221 Cal.App.3d 1169, 1182-1183 [270 Cal.Rptr. 894]; *Lewin* v. *St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368, 383-384 [146 Cal.Rptr. 892].) In the medical field, "a rule or policy decision of general application adopted by the governing authority of a hospital or professional society impinging on the right of a physician to practice his or her profession fully will not be set aside by a court unless it is substantively irrational, unlawful or contrary to established public policy or procedurally unfair." (*Id.* at p. 385; accord, *Mateo-Woodburn, supra,* 221 Cal.App.3d at p. 1183; *Centeno* v. *Roseville Community Hospital* (1979) 107 Cal.App.3d 62, 73 [167 Cal.Rptr. 183].)

A balancing test will be applied to rulemaking or policymaking cases as well as cases involving adjudicative-type decisions. "There is, however, a definite distinction in the case law between the intentional actions of a hospital directed specifically toward the exclusion of a particular physician or groups of physicians, and the actions of a hospital which may, as a practical matter, result in the exclusion of individual practitioners but were undertaken for less personally directed reasons. Cases in the first category have protected physicians; cases in the latter category have often balanced the equities in favor of the hospitals." (*Redding* v. *St. Francis Medical Center, supra,* 208 Cal.App.3d at p. 104; see also *Mateo-Woodburn* v. *Fresno Community Hospital & Medical Center, supra,* 221 Cal.App.3d at pp. 1183-1184.)

In *Lewin* v. *St. Joseph Hospital of Orange, supra*, 82 Cal.App.3d 368, the court concluded the hospital's decision to operate its chronic hemodialysis unit on a "closed staff" basis, which excluded plaintiff, was not substantively irrational—it was not arbitrary, capricious or entirely lacking evidentiary support. (At p. 389.) The decision was supported by a number of factors, including enhancement of administration, economy and efficiency. (*Id.* at pp. 389-390.) The court also determined the decision was not unlawful or contrary to public policy. (*Id.* at p. 391.) In determining the public policy question, the court used the *Willis* balancing test to determine whether the interference with plaintiff's right to practice his profession was privileged. (*Id.* at pp. 392, 394.) It concluded since the interference with plaintiff's right was minimal and the hospital's decision was justified by a number of factors, the hospital's conduct was privileged. (*Id.* at p. 394.)

Here, if the *Willis* balancing test is to be applied it would be used in determining whether LARA's decision to impose driver standards is contrary to public policy. There are a number of relevant factors. Plaintiffs possess valid licenses as drivers and they have the right to pursue careers as drivers. However, as previously discussed in part I, *ante*, the licenses do not "confer any right upon the holder thereof to employment at or participation in a race meeting." (Cal. Code Regs., tit. 4, § 1485(c).)

LARA operates the only harness racing meetings in California at particular times. Other harness racing meetings are held in California at other times or in other states or Canada at both the same time and other times. The standards LARA adopted were designed to upgrade the sport of harness racing and move it forward, to improve the public perception of harness racing by limiting the drivers in the meetings to professionals who raced regularly and were therefore "sharper" than those who did not race as often. By upgrading the sport and improving public perception of it, LARA hoped to increase attendance at and betting on harness races, and thus its profit.

In a medical setting, if these were the only factors, the balance might tip in favor of plaintiffs' right to practice as opposed to a hospital's right to increase profits. An additional factor would be the public's right to competent, available and affordable health care. But this case involves a sport, not a necessity of life. People become involved in professional sports to make money, not serve the public. And the public's interest, in the arena of sports, is in seeing the highest level of competition and the most talented of competitors. They more readily attend sporting events to see well-known and winning individuals and teams than they do to see unknowns and losers.

Based on the foregoing factors, we conclude on balance public policy does not preclude LARA's actions in setting standards for drivers in their harness racing meetings which preclude participation by plaintiffs and other drivers. Yes, there is significant interference with plaintiffs' use of their licenses, but neither board rules nor public policy dictates that those licenses be considered to confer upon their holders an absolute right to compete in any harness racing meeting in the state. Additionally, that plaintiffs may have to compete at other times or in other places in order to earn the right to compete at Los Alamitos is not contrary to public policy.

Plaintiffs also cite *Greenberg* v. *Hollywood Turf Club* (1970) 7 Cal.App.3d 968 [86 Cal.Rptr. 885] as support for their claim LARA had a monopoly on harness racing and therefore could not exclude plaintiffs from utilizing their licenses by setting standards which kept them from driving at Los Alamitos. They quote the court's statement in *Greenberg*: "We do not believe . . . that in order to protect their legitimate interests, race tracks need an absolute immunity from having to justify the exclusion of trainers or stable agents from the few places they can ply their licensed trade or can conveniently find future employment. Absolute immunities are falling into disfavor in other areas." (At p. 978.)

However, in *Greenberg*, plaintiff, a stable agent, was singled out and arbitrarily excluded from Hollywood Park racetrack without any reason being given for his exclusion. (7 Cal.App.3d at p. 972.) The court held plaintiff stated a cause of action for interference with his contract with a trainer and with his prospective employment. (*Id.* at pp. 974-978.) Nonetheless, the *Greenberg* court did emphasize that a racetrack has the right to exclude persons for legitimate reasons. (*Id.* at pp. 977-978.) Moreover, *Greenberg* dealt with an adjudicative-type action involving one individual, and with arbitrary exclusion. It did not involve a legislative-type rulemaking decision which, as previously mentioned, is treated differently. (*Mateo-Woodburn* v. *Fresno Community Hospital & Medical Center, supra*, 221 Cal.App.3d at pp. 1182-1183; *Lewin* v. *St. Joseph Hospital of Orange, supra*, 82 Cal.App.3d at pp. 383-384.) Accordingly, *Greenberg* does not support plaintiffs' claim of right to utilize their licenses at Los Alamitos, free of LARA's restrictions.

Plaintiffs also claim, in their reply brief, the standards set by LARA are not substantively rational, in that they do not result in the exclusion of the least qualified drivers, as claimed by the board. They point out that one plaintiff is Black, one a Mexican with a green card and one a woman, and they suggest, without any citation to evidence in the record, that this court cannot automatically assume these drivers were given equal opportunity to drive the higher quality horses necessary to meet LARA's standards.

■ Ordinarily, plaintiffs' failure to raise an issue in their opening brief waives the issue on appeal. (*Balboa Ins. Co.* v. *Aguirre* (1983) 149 Cal.App.3d 1002, 1010 [197 Cal.Rptr. 250].) Moreover, statements of fact contained in the briefs which are not supported by the evidence in the record must be disregarded. (*Loving & Evans* v. *Blick* (1949) 33 Cal.2d 603, 615 [204 P.2d 23]; cf. *Babcock* v. *Houston* (1973) 33 Cal.App.3d 858, 864 [109 Cal.Rptr. 454].) Accordingly, we must disregard plaintiffs' claim LARA's standards are tainted by racial and sexual discrimination.

The judgment is affirmed.

Devich, J., and Vogel, J., concurred.

Appellants' petition for review by the Supreme Court was denied August 22, 1991.