[Nos. A058935, A060033. First Dist., Div. Three. Dec. 22, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
IVAN O.B. MORSE, Defendant and Appellant.

**COUNSEL**

Hughes & Associates, Ralph D. Hughes and C. Timothy Genovese for Defendant and Appellant.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Herschel T. Elkins, Assistant Attorney General,

Laura W. Kaplan, Deputy Attorney General, John J. Meehan, District Attorney, and Lawrence C. Blazer, Deputy District Attorney, for Plaintiff and Respondent.

## OPINION

CHIN, J.—In these consolidated appeals, Ivan O.B. Morse challenges the trial court's issuance of a preliminary injunction that enjoined him from mailing to the public solicitations concerning homestead declarations without complying with Business and Professions Code section 17537.6,[1] and a subsequent judgment that granted a permanent injunction, imposed $400,000 in civil penalties for Morse's violation of section 17537.6, and ordered that Morse pay $400,000 in *cy près* restitution. He raises both constitutional and nonconstitutional challenges to the court's actions. Because the issuance of the judgment moots the appeal from the order granting a preliminary injunction, we dismiss that appeal. We also affirm the court's judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

At least since January 1988, Morse, a licensed attorney, has mailed solicitations to homeowners offering assistance in the filing of homestead declarations. Between January 1988 and January 1992, he mailed approximately 4,000,000 of these solicitations to California homeowners who had recently recorded trust deeds on their homes. As a result of these mailings, Morse prepared over 88,000 homestead declarations and received over $1.8 million in fees.

On August 8, 1991, after unsuccessfully requesting that Morse stop mailing solicitations, respondent People of the State of California filed a "COMPLAINT FOR INJUNCTION, CIVIL PENALTIES, RESTITUTION AND OTHER RELIEF" against Morse, both individually and doing business as Morse and Associates. The complaint's first cause of action alleged that Morse had violated section 17537.6, which regulates solicitations in connection with the operation of a homestead filing service. Among other things, the complaint alleged that Morse's solicitations contained untrue and misleading statements insofar as they (1) suggested that recordation of a homestead declaration would in some manner prevent the forced sale of a judgment debtor's dwelling, (2) suggested that the advantages of the homestead exemption statutes are available only to those who record a homestead declaration, (3) suggested that Morse had a file or record pertaining to the person receiving the solicitation, and (4) failed to make the statutorily required disclosures.[2]

---

[1] All further statutory references are to the Business and Professions Code unless otherwise indicated.

[2] The complaint also alleged that Morse had made false and misleading statements to the public in violation of section 17500, and had engaged in unlawful or unfair business practices within the meaning of section 17200.

The complaint requested that the court permanently enjoin Morse from violating section 17537.6, and requested imposition of civil penalties and restitution.

In a motion for a preliminary injunction filed July 31, 1992, respondent requested that the court enjoin Morse from violating section 17537.6 in connection with his mailing of solicitations to the public. In opposing the motion, Morse attacked the constitutionality of section 17537.6 on a variety of grounds. The court rejected Morse's constitutional arguments and granted the motion. It issued a preliminary injunction enjoining Morse from performing or failing to perform certain acts in accordance with section 17537.6. On August 20, 1992, Morse filed a notice of appeal from the preliminary injunction order.

On October 8, 1992, respondent moved for summary judgment or, in the alternative, summary adjudication. In opposition to the motion, Morse conceded that his solicitations failed to comply with a number of the requirements of section 17537.6, but again attacked the constitutionality of the statute and argued that respondent had failed to present any evidence that his statements were misleading.[3] In light of this concession, the court granted summary adjudication on respondent's claim for violation of section 17537.6.[4] It entered a judgment permanently enjoining Morse from violating the statute in connection with sending written solicitations to the public. The judgment also orders Morse to pay $400,000 in civil penalties under section 17536, and $400,000 in cy près restitution. Morse then filed an appeal from this judgment. We consolidated the appeal with his appeal from the preliminary injunction.

## DISCUSSION

Initially, we dismiss the appeal from the order granting the preliminary injunction. The subsequent judgment, which included a permanent injunction, moots that appeal. Therefore, we will not address the propriety of

---

[3]Morse takes the same position on appeal, stating: "The written materials [I] mailed . . . to the public did not comply with the disclosure and other requirements contained in [section] 17537.6, but the content of the materials was nondeceptive, accurate and truthful in every detail."

[4]The court denied respondent's request for summary judgment as to the causes of action for making false and misleading statements to the public and engaging in unlawful or unfair business practices.

granting the preliminary injunction. (*People* v. *Rath Packing Co.* (1978) 85 Cal.App.3d 308, 314 [149 Cal.Rptr. 431].) We thus turn to the appeal from the final judgment.

## I. *Constitutionality of Section 17537.6*

### A. *First Amendment*

Morse's primary argument on appeal is that section 17537.6, which he admittedly violated, is an unconstitutional restraint of "his rights to free commercial speech under the First Amendment . . . ." He states that "[t]here is no question here but that . . . [section] 17537.6 regulates commercial speech, since it both mandates and prohibits certain speech." He further argues that, because the written solicitation materials that he distributed were nondeceptive, accurate, and truthful, they constituted protected commercial speech that section 17537.6 unconstitutionally regulates.

 The first step in a commercial speech case is to "determine whether the expression is protected by the First Amendment." (*Central Hudson Gas & Elec.* v. *Public Serv. Comm'n* (1980) 447 U.S. 557, 566 [65 L.Ed.2d 341, 351, 100 S.Ct. 2343].) "The First Amendment's concern for commercial speech is based on the informational function of advertising. [Citation.] Consequently, there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity." (*Id.*, at p. 563 [65 L.Ed.2d at p. 349].) "The States and the Federal Government are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading [citation] . . . ." (*Zauderer* v. *Office of Disciplinary Counsel* (1985) 471 U.S. 626, 638 [85 L.Ed.2d 652, 664, 105 S.Ct. 2265]; see also *Central Hudson, supra,* at p. 563 [65 L.Ed.2d at p. 349] ["government may ban forms of communication more likely to deceive the public than to inform it"].) Thus, for commercial speech to receive First Amendment protection, "it at least must concern lawful activity and not be misleading." (*Central Hudson, supra,* at p. 566 [65 L.Ed.2d at p. 351].) Whether the inherent character of a statement places it beyond the protection of the First Amendment is a question of law which we must determine after independently reviewing the record.[5] (*Peel* v. *Attorney Disciplinary Comm'n of Ill.* (1990) 496 U.S. 91, 108 [110 L.Ed.2d 83, 99, 110 S.Ct. 2281] (plur.

---

[5]Thus, Morse is incorrect in stating that, "[s]ince the Trial Court decision related *solely* to technical violations of . . . [section] 17537.6 . . . and the Court did *not* find that any portion of the materials sent out by [him] to the public was deceptive or false, this issue is not before

opn. of Stevens, J.); *Ohralik* v. *Ohio State Bar Assn.* (1978) 436 U.S. 447, 463-464 [56 L.Ed.2d 444, 458-459, 98 S.Ct. 1912].)

 Having reviewed the record, we agree with respondent that Morse's advertisements are deceptive and misleading in a number of ways, and therefore are not entitled to First Amendment protection. Initially, Morse's complete failure to explain that, under Code of Civil Procedure sections 704.710-704.850, homeowners automatically receive a homestead exemption even if they do not record a homestead declaration renders his solicitation materials misleading. The materials variously refer to "a Homestead," "THE HOMESTEAD EXEMPTION," a "DECLARED HOMESTEAD," and a "Declaration of Homestead," and purport to discuss the benefits of "record[ing] a Homestead" and "recording a Declaration of Homestead." However, the materials never explain that, under California law, there is a difference between "the Homestead Exemption," which refers to the automatic exemption under Code of Civil Procedure sections 704.710-704.850,[6] and a "Declared Homestead,"[7] or that the benefits of the homestead exemption are available even to those who do not record a homestead declaration. Rather, the materials use these terms essentially interchangeably.[8] By using the terms interchangeably without identifying the automatic homestead exemption or discussing its benefits, the materials incorrectly suggest that the homestead exemption and a declared homestead are the same thing and that

---

this Court." Additionally, Morse's statement mischaracterizes the record. At the summary judgment hearing, as to one of Morse's representations, the trial court stated: "I'm not sure it's untrue, but it certainly is somewhat misleading." However, because Morse conceded that his materials did not comply with section 17537.6, but did not concede that they were false and misleading, the trial court granted summary judgment only for noncompliance with the statute. It explained: "Okay. I'll tell you what I'll do because I don't think it makes any difference for purposes of your appeal. I am going to grant summary adjudication of the first cause of action in favor of the State and the County. That is the violation of Section 17537.6. Just to keep this clean I will deny the summary adjudication as to the second and third causes of action."

[6]The article that contains these sections is entitled, "HOMESTEAD EXEMPTION."

[7]The article that relates to homestead declarations (Code Civ. Proc., §§ 704.910-704.995) is entitled, "DECLARED HOMESTEADS."

[8]Examples of how Morse uses the terms interchangeably without explaining the differences are the following paragraphs: "WILL MY HOMESTEAD DECLARATION PREVENT ME FROM REFINANCING MY PROPERTY? —No. Homestead Exemption does not apply to mortgages or deeds of trust placed on the property. You'll be free to refinance the property or obtain second and third deeds of trust." "ARE THERE DISADVANTAGES TO RECORDING A DECLARATION OF HOMESTEAD? —No. Homestead is a valuable right given to you by law. By recording a Declaration of Homestead, you are exercising your right to protect your home to the maximum extent allowed by law."

an exemption applies only if there is a recorded homestead.[9] They therefore are deceptive and misleading.[10]

Morse's materials are also misleading in their discussion of a homeowner's protection against the forced sale of the home. The very first paragraph of the "HOMESTEAD INFORMATION SHEET" (Information Sheet) that Morse distributed states: "WHAT IS THE PURPOSE OF HOMESTEAD EXEMPTION? The policy underlying all homestead laws is to provide a place for the family where they [*sic*] may reside and enjoy the comforts of a home, free from the anxiety that it may be taken away from them [*sic*]." This statement of purpose suggests that the recording of a homestead declaration necessarily prevents the forced sale of a family's home; otherwise, the family could not be "free from the anxiety that it may be taken away . . . ." However, even where a homeowner records a homestead declaration, a creditor may force the sale of a home through a levy pursuant to a writ of execution. (See Code Civ. Proc., §§ 704.740-704.800, 704.970.)[11] Morse's statement is misleading

---

[9]The following paragraph from Morse's materials provides a clear example of this confusion: "WHO IS ELIGIBLE FOR THE HOMESTEAD EXEMPTION? —Every homeowner who resides in his/her home is entitled to this protection. The basic requirement is that the dwelling be your principal place of residence." It is unclear whether this paragraph refers only to a declared homestead or, because it speaks generally of "THE HOMESTEAD EXEMPTION," it also refers to the automatic exemption. However, because the materials refer interchangeably to "THE HOMESTEAD EXEMPTION" and "a Declaration of Homestead," and never explain that there is an automatic exemption, they create the impression that a homeowner can obtain a "Homestead Exemption" only by recording a "Declaration of Homestead." The paragraph furthers this misimpression by using the word "ELIGIBLE," which suggests that, although all homeowners may meet the requirements for obtaining a homestead exemption, they receive one only if they record a homestead declaration. (See *Samuels* v. *Hite* (1950) 35 Cal.2d 115, 116 [216 P.2d 879] ["the word 'eligible' means 'capable of being chosen—the subject of selection or choice' "]; Black's Law Dict. (6th ed. 1990) p. 521, col. 1 [defining "[e]ligible" as "[f]it and proper to be chosen" or "[c]apable of being chosen"].)

[10]Morse maintains that section 17537.6 "does not mandate that anyone . . . has an affirmative obligation to mention the automatic homestead exemption in its solicitations." However, the statute does prohibit anyone from representing that any of the benefits relating to the automatic exemption "are available only to persons who prepare or record a homestead declaration." (§ 17537.6, subd. (a)(3).)

[11]Under Code of Civil Procedure section 704.970, subdivision (a), a creditor has the same right of levy pursuant to a writ of execution "[w]hether or not a homestead declaration has been recorded[.]" Subdivision (b) of that section directs that "[a]ny levy pursuant to a writ of execution . . . and the sale pursuant thereto shall be made in compliance with" the statutes governing the automatic homestead exemption (Code Civ. Proc., §§ 704.710-704.850), "and the judgment debtor and the judgment creditor shall have all the rights and benefits provided by" those statutes. Under Code of Civil Procedure section 704.800, subdivisions (a) and (b), even if the automatic homestead exemption applies, a creditor may force the sale of a homestead if, at a court-ordered sale, there is a bid that (1) "exceeds the amount of the homestead exemption plus any additional amount necessary to satisfy all liens and encumbrances on the property, including but not limited to any attachment or judgment lien" and (2) "is 90 percent or more of the fair market value . . . ."

in suggesting otherwise.[12]

Nothing that follows in the Information Sheet, or anything else in the materials, explains that, under certain circumstances, a creditor can force the sale of the home even if the homestead exemption applies and there is a recorded homestead declaration.[13] In fact, Morse's materials are otherwise silent as to the issue of a forced sale, except for the following paragraph: "3. If a creditor tries to force a sale of your home, with a Declaration of Homestead you'll have an important advantage over him in court. The creditor has the burden of proof to show why you should not be allowed the Homestead Exemption. Otherwise, the court will take your Declaration at its face value and grant you the exemption." Rather than clarifying the misimpression that the opening paragraph of the Information Sheet creates, this paragraph is further deceptive in suggesting that, so long as the court grants a homestead exemption, a creditor cannot force the sale of a home. However, as we have previously explained, a creditor may force a sale even if the homestead exemption applies. (See Code Civ. Proc., §§ 704.740-704.800, 704.970.)

This paragraph is further misleading regarding the burden of proof. The paragraph suggests that, absent a recorded homestead declaration, the homeowner bears the burden of proving the applicability of the exemption. Indeed, in his brief on appeal, Morse explicitly states that, "[w]ith an automatic exemption, the homeowner carries the burden of proof of entitlement." He is incorrect. Under Code of Civil Procedure section 704.780, subdivision (a)(1), even without a recorded homestead declaration, the *creditor* has the burden of proof "[i]f the records of the county tax assessor indicate that there is a current homeowner's exemption or disabled veteran's exemption for the dwelling claimed by the judgment debtor . . . ."[14] This section "creates a presumption in favor of exempt status if the judgment

---

[12]Morse asserts that the statement "cannot be misleading" because the wording of the statement "was derived from the Supreme Court of California and the California Court of Appeal . . . ." However, regardless of the source of the language, the statement is deceptive absent an explanation that, even with a recorded homestead declaration, a creditor may be able to force a sale.

[13]Although Morse's materials indicate that a declared homestead protects a homeowner's equity from lien attachment up to certain amounts, they do not explain that a creditor may, under certain circumstances, force the sale of the home despite the existence of the protection.

[14]Code of Civil Procedure section 704.780's reference to a "homeowner's exemption" is not a reference to a recorded homestead declaration under Code of Civil Procedure section 704.930. Rather, the "homeowner's exemption" to which Code of Civil Procedure section 704.780 refers is the exemption under sections 218 and 253.5 of the Revenue and Taxation Code. (See Recommendation Relating to the Enforcement of Judgments Law (Sept. 1982) 16 Cal. Law Revision Com. Rep. (1982) p. 1095, fn. 301 and accompanying text.) This distinction is evident from the fact that homestead declarations are filed "in the office of the

debtor has claimed a homeowner's or veteran's property tax exemption for the dwelling." (Recommendation Relating to the Enforcement of Judgments Law (Sept. 1982) 16 Cal. Law Revision Com. Rep., *supra*, at p. 1095.) Moreover, it places an affirmative burden *on the creditor*, in applying for an order of sale, to indicate "whether or not the records of the county tax assessor indicate that there is a current homeowner's exemption or disabled veteran's exemption for the dwelling and the person or persons who claimed any such exemption." (Code Civ. Proc., § 704.760, subd. (a).) Thus, Morse's materials are deceptive in suggesting that, in order not to have the burden of proving the applicability of the homestead exemption, a homeowner must record a homestead declaration.

Given our conclusion that Morse's materials are deceptive and misleading, they are not entitled to commercial speech protection under the First Amendment.[15] Moreover, given the nature of his action, Morse is incorrect in arguing that he may challenge the constitutionality of section 17537.6 even if his own conduct is unprotected. ■ "In the First Amendment context, [we have] permitted attacks on overly broad statutes without requiring that the person making the attack demonstrate that in fact his specific conduct was protected. [Citations.]" (*Bates* v. *State Bar of Arizona* (1977) 433 U.S. 350, 380 [53 L.Ed.2d 810, 833-834, 97 S.Ct. 2691].) However, the justification for this "departure from the traditional rule that a person may not challenge a statute on the ground that it might be applied unconstitutionally in circumstances other than those before the court . . . [¶] . . . applies weakly, if at all, in the ordinary commercial context." (*Ibid.*) Accordingly, the overbreadth doctrine does not apply "to professional advertising, a context where it is not necessary to further its intended objective. [Citation.]" (*Id.*, at p. 381 [53 L.Ed.2d at p. 834]; see also *Shapero* v. *Kentucky Bar Assn.* (1988) 486 U.S. 466, 478 [100 L.Ed.2d 475, 487-488, 108 S.Ct. 1916]; *Hoffman Estates* v. *Flipside, Hoffman Estates* (1982) 455 U.S. 489, 497 [71 L.Ed.2d 362, 370, 102 S.Ct. 1186] ["overbreadth doctrine does not apply to commercial speech"]; *Ohralik* v. *Ohio State Bar Assn.*, *supra*, 436 U.S. at p. 462, fn. 20 [56 L.Ed.2d at p. 457].) We therefore decline to address whether section 17537.6 as it applies to the conduct of others is constitutional under the First Amendment.

### B. *Vagueness*

■ Morse also contends that section 17537.6 is unconstitutionally vague as it applies to lawyers. Subdivision (e)(1) of that section, which

county recorder of the county where the dwelling is located" (Code Civ. Proc., § 704.920), not with "the county tax assessor . . . ." (Code Civ. Proc., § 704.780, subd. (a)(1).)

[15]Our discussion of the ways in which Morse's materials are deceptive and misleading is not exhaustive. Our review of the record discloses other ways in which the materials are deceptive and misleading. For purposes of deciding this appeal, it is not necessary to discuss all of the deceptions.

defines a " 'Homestead filing service,' " excludes "any service performed by an attorney at law authorized to practice in this state for a client who has retained that attorney or an employee of that attorney acting under the attorney's direction and supervision." Morse complains: "The statute does not define the word 'retained,' nor is the definition contained as part of the legislative history. The statute does not tell the reader whether the client has to be an existing client, one who had 'retained' the attorney for other matters before discussing Declarations of Homestead, or whether the 'retained' exemption merely applies to an attorney being hired to prepare a Declaration of Homestead." Morse concludes that, "[s]ince ordinary people of common intelligence could guess as to the meaning of portions of the statute, . . . applying this statute to [him] would violate [his] due process rights . . . ."

The guarantee of due process of law includes the requirement of a reasonable degree of certainty in legislation. (*People* v. *Superior Court (Caswell)* (1988) 46 Cal.3d 381, 389 [250 Cal.Rptr. 515, 758 P.2d 1046].) To withstand a vagueness challenge, "a statute must be sufficiently definite to provide adequate notice of the conduct proscribed. '[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law. [Citations.]' [Citations.]"[16] (*Caswell, supra,* 46 Cal.3d at p. 389.) In considering whether a legislative proscription is sufficiently clear to satisfy the requirements of fair notice, we consider not only the language of the challenged statute, but also its legislative history. (*Walker* v. *Superior Court* (1988) 47 Cal.3d 112, 143 [253 Cal.Rptr. 1, 763 P.2d 852].) "We thus require citizens to apprise themselves not only of statutory language but also of legislative history . . . and underlying legislative purposes [citation]. [Citation.]" (*Ibid.*)

Here, even if we agreed with Morse that the language of section 17537.6 is uncertain, in light of its legislative history, we must reject his vagueness claim.[17] Prior to its final passage, the bill that became section 17537.6 provided in relevant part: " 'Homestead filing service' does not include any service performed by an attorney at law authorized to practice in

---

[16]A statute must also "provide standards for its application and adjudication in order to avoid the dangers of arbitrary and discriminatory enforcement. [Citation.]" (*Williams* v. *Garcetti* (1993) 5 Cal.4th 561, 575 [20 Cal.Rptr.2d 341, 853 P.2d 507].) Morse does not attack section 17537.6 on this ground, and we therefore do not address it.

[17]We grant Morse's request that we take judicial notice of the legislative history of section 17537.6. We deny his request that we take judicial notice of a voluntary bankruptcy petition that he filed after the trial court entered judgment. (See *In re Issac J.* (1992) 4 Cal.App.4th 525, 535 [6 Cal.Rptr.2d 65] [refusing to reevaluate trial court decision in light of postjudgment events]; *In re Daniel C. H.* (1990) 220 Cal.App.3d 814, 830 [269 Cal.Rptr. 624] [appellate court normally will not consider matters occurring after judgment].)

this state . . . ." (Assem. Amend. to Assem. Bill No. 684 (1987-1988 Reg. Sess.) May 4, 1987.) The Senate amended this provision of the bill to its final form by adding the phrase, "for a client who has retained that attorney . . . ." (Sen. Amend. to Assem. Bill No. 684 (1987-1988 Reg. Sess.) Aug. 17, 1987.) According to the legislative history, the purpose of this amendment was to "narrow the exemption for homestead filing services provided by attorneys or their employees to services provided *to a client* of the attorney's. Otherwise, the bill would have permitted attorneys or their agents to engage in the reprehensible mail order practices barred by this bill." Thus, it is clear that the exclusion applies only to services an attorney provides to preexisting clients, and that the Legislature intended to prohibit attorneys from doing precisely what Morse did in this case. We therefore reject Morse's vagueness challenge.[18]

## C. *Due Process*

Morse also contends that section 17537.6, subdivision (b)(1), violates his due process rights under *Tot* v. *United States* (1943) 319 U.S. 463 [87 L.Ed. 1519, 63 S.Ct. 1241]. We disagree.

We reject Morse's claim because we find *Tot* completely inapplicable to this case. *Tot* addresses the constitutionality of a statute that creates an evidentiary presumption, i.e., a statute that "make[s] the proof of one fact or group of facts evidence of the existence of the ultimate fact on which guilt is predicated."[19] (*Tot* v. *United States, supra,* 319 U.S. at p. 467 [87 L.Ed.2d at p. 1524].) Section 17537.6 does not create an evidentiary presumption. Therefore, the analysis in *Tot* is inapplicable.[20]

## II. *Award of Penalties and Restitution*

In addition to challenging the constitutionality of section 17537.6, Morse attacks the trial court's assessment of civil penalties on a variety of grounds. ■ He first argues that the award was improper because the

---

[18]Moreover, we note that Morse's solicitation materials belie his claim that he did not know he was operating a homestead filing service. In the cover letters he sent with his materials between April and December 1988, Morse stated: "To ASSURE PROMPT PROCESSING, SEND IN YOUR *HOMESTEAD SERVICE* APPLICATION WITHIN 15 DAYS!!" (Italics added.) Thus, notwithstanding his argument on appeal, Morse himself thought he was operating a homestead filing service. Morse changed the language of his cover letters by deleting the reference to a "HOMESTEAD SERVICE APPLICATION" only after receiving a letter informing him that he was violating section 17537.6.

[19]The statute at issue in *Tot* provided that possession of a firearm or ammunition by certain persons " '. . . shall be presumptive evidence that such firearm or ammunition was shipped or transported or received . . . in violation of this Act.' " (*Tot* v. *United States, supra,* 319 U.S. at p. 464 [87 L.Ed.2d at p. 1522].)

[20]In the trial court, Morse candidly acknowledged that *Tot* "is not directly on point . . . ."

court made the award "without first receiving and considering evidence of [his] financial condition, wealth and profits. [Citations.]."

Without agreeing with Morse's assertion that such evidence is always necessary in determining the amount of an award of civil penalties,[21] we find sufficient financial information in the record to support the award. Respondent submitted evidence showing that, between January 1988 and April 1992, Morse received over $1.8 million in fees from those for whom he prepared homestead declarations. This evidence was sufficient to support the court's award of $400,000 in civil penalties, notwithstanding the absence of evidence of Morse's net profit or other evidence of his financial condition.[22] (See *Kinney* v. *Vaccari* (1980) 27 Cal.3d 348, 356, fn. 6 [165 Cal.Rptr. 787, 612 P.2d 877] [upholding penalty given evidence of "monthly rental receipts"]; *People* ex rel. *Van de Kamp* v. *Cappuccio, Inc.* (1988) 204 Cal.App.3d 750, 765 [251 Cal.Rptr. 657] [affirming civil penalty of $73,528.05 in light of evidence that defendant had "gross income" in 1979 of over $1.5 million]; see also *Walker* v. *Signal Companies, Inc.* (1978) 84 Cal.App.3d 982, 998 [149 Cal.Rptr. 119] [affirming punitive damage award that was "less than 1 percent of gross assets at book value of each defendant"].)

We next reject Morse's assertion that the court erred in basing the damage award "on the number of solicitations mailed, rather than the number of people who received and read the solicitations, or who responded to the solicitations. [Citations.]" In *People* v. *Superior Court* (*Jayhill Corp.*) (1973) 9 Cal.3d 283, 289 [107 Cal.Rptr. 192, 507 P.2d 1400, 55 .A.L.R.3d

[21]In support of his argument, Morse cites section 17536, subdivision (b). However, that section directs the court to consider "the defendant's assets, liabilities, and net worth" only if these circumstances are "presented by any of the parties to the case . . . ." (§ 17536, subd. (b).) At the summary judgment hearing, Morse's counsel stated that Morse was "entitled to a hearing on the damages or a hearing to determine factually how much he's made" from his homestead declaration business. There is a difference between the amount Morse made through his solicitations and his "assets, liabilities, and net worth." Thus, his invocation of an alleged right to a hearing regarding "how much he's made" was not a request generally for a hearing regarding his wealth and financial condition. Nor does it meet the statutory requirement that relevant circumstances be "presented by . . . the parties to the case" (§ 17536, subd. (b)), especially given Morse's position that respondent bore the burden of proof and his refusal to respond to the court's questions regarding his profits. Finally, Morse's citation to cases involving punitive damages does not establish that such proof is required in assessing statutory penalties. (See *Beeman* v. *Burling* (1990) 216 Cal.App.3d 1586, 1601 [265 Cal.Rptr. 719] ["there is no authority for the proposition that *statutory* damages . . . must be supported by evidence of the defendant's wealth"].)

[22]Given our conclusion, we need not address Morse's argument that respondent bore "[t]he burden of proof concerning financial condition, wealth and profits . . . ." We note, however, that in *State of California* v. *City and County of San Francisco* (1979) 94 Cal.App.3d 522, 530-531, we held that, once the evidence establishes a statutory violation under Water Code section 13385, it becomes the defendant's burden to establish that the court should impose a penalty less than the statutory maximum.

191], which involved charges of false and misleading advertising in connection with door-to-door solicitation, the Supreme Court held that the number of violations under section 17536 "is to be determined by the number of persons to whom the misrepresentations were made," and that a court may impose up to a $2,500 penalty "for each customer solicited by a defendant." Applying this test, we find that each person to whom Morse sent a solicitation constitutes a "customer solicited by" Morse and a person "to whom the misrepresentations were made . . . ."[23] (*Jayhill Corp., supra*, 9 Cal.3d at p. 289.) Thus, the trial court did not err.

In arguing to the contrary, Morse incorrectly relies on *People* v. *Superior Court (Olson)* (1979) 96 Cal.App.3d 181 [157 Cal.Rptr. 628]. In *Olson*, defendant disseminated false and misleading newspaper advertisements in violation of section 17500. (*Olson, supra*, at pp. 184-185.) On appeal, the court held that, for purposes of assessing penalties under section 17536, "a single publication constitutes a *minimum* of one violation with as many additional violations as there are persons who read the advertisement or who responded to the advertisement by purchasing the advertised product or service or by making inquiries concerning such product or service." (*Olson, supra*, at p. 198.) In reaching this conclusion, the court rejected the argument that "the circulation of the newspaper should be the measure of the number of violations." (*Id.*, at p. 196.) The court reasoned that this measure could result in a penalty in excess of $2.5 billion for each edition of the newspaper (*id.*, at p. 197), that "it is 'unreasonable' to assume that the Legislature contemplated penalties of that magnitude for a false advertisement in a single edition of a newspaper," and that "[t]o so interpret the statute would render it violative of the due process prohibition against 'oppressive' or 'unreasonable' statutory penalties. [Citation.]" (*Id.*, at p. 198.)

*Olson* is inapplicable to the facts of this case. In contrast to the mass appeal at issue with the newspaper advertising in *Olson*,[24] Morse conducted a direct-mail campaign involving highly individualized solicitations. The address window on Morse's solicitations displayed not only the name and address of the homeowner-recipient, but also the name of the homeowner's lender. Moreover, Morse included in the solicitation materials the mortgage balance of the homeowner. Morse obtained this information, and determined the recipients of his solicitations, from public records that identified those "California residents who ha[d] recently recorded a trust deed." Thus, Morse

---

[23]Under Evidence Code section 641, "[a] letter correctly addressed and properly mailed is presumed to have been received in the ordinary course of mail."

[24]The court in *Olson* twice emphasized that it was interpreting section 17536 "in the context of a newspaper advertisement . . . ." (*People* v. *Superior Court (Olson), supra*, 96 Cal.App.3d at p. 198.)

selected recipients and designed his materials to ensure that his solicitations would be noticed and read.[25] Under these circumstances, it is reasonable to assume that the Legislature contemplated a penalty for each direct mailing. This interpretation does not violate the due process prohibition against oppressive or unreasonable statutory penalties.[26]

██ We also reject Morse's contention that the penalty award is unconstitutionally excessive. In his appellate brief, Morse asserts that the penalties the trial court imposed "approximate 190% of [his] total net worth, well over 150% of the total profit [he] realized . . . between 1988-1992 from the homestead declaration venture, and 800% of the profit [he] generated . . . from the non-homestead activities of his law practice for the entire year of 1992." However, because there is no evidence in the record to support these assertions, we must disregard them. (*Tisher* v. *California Horse Racing Bd.* (1991) 231 Cal.App.3d 349, 361 [282 Cal.Rptr. 330].) Indeed, Morse did not contend below that the penalty was disproportionate to his wealth or ability to pay, even when the court indicated the amount of the penalty it intended to impose and asked him to comment.[27] Having failed to make this argument below, and having failed to include in the record evidence to support it, Morse cannot now challenge the penalties as excessive.[28] (See *Kinney* v. *Vaccari, supra*, 27 Cal.3d at p. 356, fn. 6 [rejecting claim that penalty was

---

[25]The nature and presentation of the information Morse included in his solicitations, and his method for selecting recipients, rebut his characterization of his mailings as " 'junk mail' " that many people do not read. Nor does the record support his claim that the envelopes of his solicitations "clearly indicated that the contents were 'advertisement.' " The record contains five sample cover letters that Morse sent with his solicitations. Only two of them indicate that they are a "PRIORITY ADVERTISEMENT." Even as to these two, the record does not establish that this information was visible from the outside of the envelope.

[26]The two additional cases Morse cites in his reply brief do not suggest a different conclusion. In both, courts looked to evidence of completed transactions to establish *a minimum number* of violations sufficient to affirm penalty awards. (*People* v. *Toomey* (1984) 157 Cal.App.3d 1, 22 [203 Cal.Rptr. 642] [evidence of sales sufficient to support finding of "at least 150,000 violations"]; *People* v. *Bestline Products, Inc.* (1976) 61 Cal.App.3d 879, 923 [132 Cal.Rptr. 767] [evidence that 3,000 people acted in response to solicitations supports finding "of at least 3,000 violations"].) Neither suggests that there were not additional violations in connection with solicitations that did not result in completed transactions. (See *Bestline Products, Inc., supra*, at p. 923 [evidence supports imposition of penalties "based upon false and misleading representations having been made to upward of 10,000 prospective distributors, 3,000 of whom in fact acted thereon to become direct or general distributors"].)

[27]The court asked Morse, "Do you feel 20 cents a violation is excessive?" Morse's counsel replied: "I think it would be inappropriate for me to state my opinion because I don't believe that's my call."

[28]Moreover, "[w]hen compared with the maximum possible fine of $2,500 per violation, the trial court's assessment [of 20 cents per violation] was reasonable, if not lenient." (*People* v. *Toomey, supra*, 157 Cal.App.3d at p. 23; see also *People* ex rel. *Van de Kamp* v. *Cappuccio, Inc., supra*, 204 Cal.App.3d at p. 765 [court's award of $124.20 per violation was "well within its discretion" under statute authorizing award of $2,500 per violation].)

confiscatory because it exceeded property's value given failure "to introduce any evidence of that value at trial"]; *People* ex rel. *Smith* v. *Parkmerced Co.* (1988) 198 Cal.App.3d 683, 692 [244 Cal.Rptr. 22] [upholding penalty "[i]n view of the fact that [defendants] have not claimed the award was disproportionate to their wealth or ability to pay"].)

Finally, we reject Morse's attack on the restitution award. Morse asserts generally that the court's order "has no basis in fact or law, is oppressive and arbitrary, and denies [him] his due process rights . . . ." However, he cites no authority to support these assertions. ■ "Where a point is merely asserted . . . without any argument of or authority for the proposition, it is deemed to be without foundation and requires no discussion by the reviewing court. [Citation.]"[29] (*Atchley* v. *City of Fresno* (1984) 151 Cal.App.3d 635, 647 [199 Cal.Rptr. 72].)

## DISPOSITION

The appeal from the order granting the preliminary injunction is dismissed as moot. The judgment is affirmed.

Merrill, Acting P. J., and Werdegar, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 17, 1994.

---

[29]In his reply brief, Morse contends that the restitution award is improper because those who responded to his solicitations received exactly what they believed they were receiving and for the price they believed they were to pay. However, given Morse's failure to raise this argument in his opening brief, we need not address it. (*Tisher* v. *California Horse Racing Bd.*, *supra*, 231 Cal.App.3d at p. 361.)