Filed 9/3/25  In re L.M. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re L.M. et al., Persons Coming Under the Juvenile Court Law. | D085812 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. EJ3832) |
| v. | |
| S.M., | |
| Defendant and Appellant. | |

APPEALS from orders of the Superior Court of San Diego County, Mark T. Cumba, Judge.  Affirmed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Appellant S.M., Father.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Natasha C. Edwards, Deputy County Counsel for Plaintiff and Respondent.

S.M. (Father) appeals from a March 10, 2025, jurisdictional finding and dispositional order involving his daughter, L.M., and separately appeals a March 19, 2025, jurisdictional finding and dispositional order involving his remaining three children, G.H., S.M.,[1] and M.M.  The juvenile court assumed jurisdiction under Welfare and Institutions Code[2] section 300, subdivision (b) as to all four children and subdivision (d) as to G.H. and L.M.  The children's mother (Mother) has not appealed.

Father challenges only the sufficiency of the evidence supporting the court's jurisdictional findings related to sexual abuse under section 300, subdivision (d) for L.M. and G.H.  The San Diego County Health and Human Services Agency (the Agency) counters that Father's appeals are not justiciable because they do not contest the court's findings related to domestic violence and parental substance abuse under section 300, subdivision (b), which independently provide a basis for jurisdiction over the children.  We conclude that the appeals are justiciable and that the record contains substantial evidence justifying the court's assertion of jurisdiction under subdivision (d).  Accordingly, we affirm the court's orders.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The Agency first interacted with Mother and Father in 2014 when Mother tested positive for methamphetamine after giving birth to G.H.  G.H. was reunified with her parents in 2016, and the court terminated jurisdiction in 2023.

---

[1]     Father and son share the same initials.  All further references to "S.M." refer to the son.

[2]     Further undesignated statutory references are to the Welfare and Institutions Code.

## A. Evidence Supporting Original Section 300 Petition

At the time of the relevant incidents, Mother and the children lived in a home adjacent to the paternal grandparents, and Father lived in a trailer at the back on the property.  On July 3, 2024, Mother was giving L.M., then age five, a bath when L.M. complained the bath water was causing a burning sensation on her genitals.  According to Mother, when she asked how L.M. was injured, L.M. responded, "daddy scratched me."  Mother checked L.M.'s vaginal area and saw that it was red, swollen, and irritated but believed it could have resulted from L.M. swimming at a public pool all day.  Mother confronted Father and the paternal grandmother about the disclosure, but both denied knowing anything about it.

On July 15, 2024, Mother told the children Father would be coming home soon. Mother reported that L.M. responded that she did not want Father to return to the house, explaining, "daddy touches me, I don't want him here."  She told Mother she was in bed when Father removed her underwear and rubbed her "privates."  L.M. said "it hurt" and she "didn't like it."

Mother called the police the next day to report child sexual abuse. Responding deputies conducted a minimum facts interview with L.M., who said Father had touched her "privates" with his hand one time and that it "hurt me."  She told officers it occurred "on my mom's bed."  An emergency protective order was issued protecting Mother and L.M. from Father.

Later that day, an Agency social worker contacted a detective involved in the investigation.  According to the detective, Mother stated that L.M. told her on July 3 that it "hurt to pee" and that Father had touched her "privates."  Mother said L.M. indicated this by pointing to her vagina and doing a

"rubbing" motion.  The detective said he was informed that the paternal grandmother called L.M. a "liar" in Spanish.

The social worker then spoke with Mother.  Mother stated that on July 3, L.M. told her Father "scratched" her private area and touched her there "all the time."  Mother said that when she and Father confronted L.M. and Father asked if Mother had told her to say it, L.M. responded, "Yes mom told me to say it."  Mother told the social worker the paternal grandmother accused her of "putting that in her head," and called L.M. a "dirty little girl" and a "liar."  As to L.M.'s July 15 reporting, Mother said L.M. told her Father took her underwear off and made a circular motion with his hands on her private area.  L.M. explained that she was in Mother's bed, and S.M. was asleep on the couch.

The social worker separately interviewed the children.  G.H., age 9, told her L.M. said Father had touched her privates, but that she believed L.M. lied.  She confirmed the paternal grandmother called L.M. a "dirty little girl" and said the grandmother attempted to hit L.M.  G.H. denied ever witnessing or knowing of any inappropriate touching or interaction in the home between Father and her siblings.  She indicated her private areas are her "breasts and vagina" and denied anyone touching or bothering her in those areas.  However, she stated that she did not feel safe and that it was "scary" to see her parents fight because she does not know if Father will hit Mother.

S.M., age 7, also confirmed that L.M. had told him Father touched her privates, and added, "daddy made [L.M.] say it was mommy so it was definitely daddy."  When the social worker said, "tell me more about that," he responded, "I don't want to talk about it."  He denied anyone touching him in his private area or knowing if his siblings' rules for their privates had been broken.

4

L.M. asserted that Father touched her vagina and placed her hand on her vagina to indicate. She then stated that she did not want to talk about it and asked to skip the question.

M.M., then only three years old, said "I don't know about that" when asked if he had ever seen adults argue in the home and about the police coming to the house.

A new report was made to the Child Abuse Hotline on July 17, 2024. The caller reported Mother had been using methamphetamine every night and had a bag of drugs. The individual further relayed that Mother told a family member on July 4 that L.M. pointed to her buttocks and vagina when asked where Father touched her. The caller indicated that L.M. appeared to be coached as she had wide eyes, appeared fearful, and kept looking at Mother before answering.

The next day, the social worker spoke with the paternal grandmother, who expressed concern regarding Mother's substance abuse based on what Father had told her and commented that Mother "was chubby and is now skinny." In her view, Mother was manipulating L.M. to lie and was "going to send an innocent man to jail." The paternal aunt told the social worker Mother hit, yelled at, and medicated the children with sleeping pills. She said Mother made L.M. say that Father touched her "in the front and the back." According to the aunt, L.M. recanted upon questioning, and G.H. said L.M. saw it on television.

On July 19, a forensic interviewer met with L.M. L.M. told her that she informed Mother that Father touched her privates and added, "I hate him when he touch my private." L.M. explained that she was sleeping on Mother's bed while Mother was at the store. She stated, "[h]e touched me right here (pointed to genital area) and right here (pointed to her buttock)"

with his hands and said that she told him to "stop touching" her private. Although G.H. was sleeping in the same room, L.M. said her siblings did not believe her. L.M. told the interviewer, "[t]hey said, I was lying, but I'm not lying. That make me sad." She denied any other incidents had occurred.

A social worker called Mother a little over a week later to follow up on missed drug testing, and Father answered the phone. When the worker asked what led to Father returning, Mother said she learned that L.M. had watched an inappropriate cartoon on YouTube about "how to make babies" that led her to say Father touched her. Mother also explained that they took L.M. for a physical exam at Rady Children's Hospital, which revealed no signs of sexual abuse. In following up with the hospital, the social worker learned that Mother was adamant they examine L.M. even though staff informed her that an exam would not be able to confirm or deny whether sexual abuse occurred.

In early August 2024, Mother said she found out G.H. and L.M. had watched pornographic videos on G.H.'s iPad in which the girl made the same circular motions L.M. had demonstrated and said "daddy." Father and Mother questioned L.M. again and reported that she admitted scratching herself and accusing Father because she did not want to get in trouble for "scratching herself." For the remainder of the month, the social worker had difficulty reaching the parents, and both parents told her to contact their attorneys.

### B. Original Section 300 Petition and Detention Hearing

On August 28, the Agency filed a petition on L.M.'s behalf under section 300, subdivision (d) alleging Father sexually abused her by touching her genital area and buttocks with his hand while she lay in bed, causing her pain in her genital area. At the detention hearing, the court ordered L.M.

6

removed from Father and detained with Mother on the conditions that (1) Father not be on the property; and (2) Mother allow unannounced and announced visits by the Agency and minor's counsel. The court allowed Father supervised visitation so long as Mother was not the supervisor.

### C. Evidence Supporting Jurisdiction and Disposition as to L.M.

On the evening of September 9, Mother left social worker Sanchez a voicemail informing her she had contacted law enforcement. She explained that, after she told the children they would be seeing Father again, G.H. said he touched her inappropriately and S.M. claimed Father made him give Father oral sex. Mother later left another voicemail saying she had "jumped the gun" by calling the police because the children subsequently reported their allegations were not true and they only said it because Father made them do chores.

Sanchez met with Mother on September 10, and Mother apologized for the messages. Mother admitted she had started drinking alcohol again and had taken her sons' Ritalin three days prior. Sanchez also spoke with L.M. and observed that she was generally happy. L.M. said she wanted Father to return, but when the social worker asked why, L.M. stated, "move on to the next question." Sanchez noted that Father called Mother multiple times during the interview.

On September 23, police responded to a domestic violence report from the home. Mother told an officer that on September 3, Father banged on the door and then punched her in the face when she opened it. She fell and hit her head on the floor, and she said Father threatened to kill her if she called the police.

The next day, Sanchez met with the family again. L.M. denied that anyone ever touched her private parts and said she wanted Father to move back into the house. She mentioned that she saw Father punch Mother, but after Mother said L.M. was not present and had heard it from her sister, L.M. agreed she did not see the incident. G.H. explained that she, S.M., and L.M. were all in a king-sized bed when Father barged into the house and punched Mother on the chin. She said L.M. was asleep but may have heard. G.H. denied ever watching videos that showed private parts and said no one had touched hers. As to L.M., she reported, "[L.M.] says dad touched her, but we don't know yet." G.H. thought L.M. was lying because "[her] dad wouldn't do that." S.M. also confirmed seeing Father punch Mother. When asked if anyone had ever touched his private parts, S.M. became quiet and replied, "I don't want to answer." He acknowledged he was worried about answering, but eventually shook his head no when asked about being touched and said no one had ever told him to say something that was not true. He then expressed that he was worried about going to foster care. Nonetheless, all three children indicated they enjoyed visiting with Father (M.M. refused to be interviewed). The investigation of G.H. and S.M.'s sexual allegations was eventually closed as unfounded.

Meanwhile, Mother admitted Father came into the home on September 3, punched her in the face, and knocked her to the ground. She did not initially report it because she was afraid the children would be removed. It is not clear if the Agency discussed this incident with Father, but he did admit to drinking alcohol again. Mother sought a restraining order protecting herself and the children from Father. After a hearing, the court denied the request, finding Mother not credible and Father credible.

Throughout September and October 2024, Mother and Father made numerous allegations against each other and paternal grandmother sought a restraining order, claiming Mother had hit her. When interviewed about the various allegations, paternal grandmother reported that after Mother told her about L.M.'s claim, she questioned L.M. in front of the grandmother, and L.M. said Father touched her. But the grandmother said L.M. appeared scared, had wide eyes, and otherwise stayed quiet. She further related that G.H. denied Father touched her and told her L.M. was lying.

Social worker Sanchez also spoke with Mother's ex-husband, who reported she was abusive toward him, their two children, and her disabled sister and appeared to be under the influence of alcohol or other substances during court proceedings. He claimed she made false rape allegations against him and falsely claimed his brother molested their children. Nothing came of the accusations, and he was awarded full custody of the children. He said Mother recently asked his daughter to pick her up and stated that her daughter had been raped.

On November 1, 2024, L.M. told social worker Sanchez her parents fought a "long time ago" about "something I lied, but I didn't lie" and said she did not know yet why they thought she lied. When asked if someone touched her private parts, L.M. initially said no, but then added, "only my dad." She reported it was "a long time ago," that it happened "a lot of times," and that "[she] didn't like it."

In late November, the paternal grandmother told Sanchez Father was very depressed from being away from the children and told her he no longer wanted to live.

Throughout this time, the parents engaged in some services but not others and only sporadically drug tested. On November 13, Father testified

positive for amphetamine and methamphetamine and then cancelled his next five visits with L.M.

### D. New Allegations and Detention from Mother

On January 2, 2025, Mother confronted Father about a new allegation S.M. made that Father had sexually abused all the children. When he denied the allegations, she threatened to kill him if he touched the children and struck him on the leg with a beer bottle. Father pushed Mother onto a bed in the trailer, got on top of her, pulled her hair, and bit her finger. All four children came to the trailer, and Mother yelled to them to call the police. Father fled, but a police officer arrested him upon his return.

When interviewed, S.M. told an officer Father took his pants off and did "weird stuff" with him that made him uncomfortable. Mother provided the officer with the shorts S.M. was wearing when the assault occurred on December 31, 2024, which she said she found in the van. The officer observed a dried white mucus-like substance on the hem. S.M. also told the officer Father had tried to take him into the van again that day, but that he feared going in the trailer because he thought he would be raped. When asked, S.M. said he did not know what it meant to be raped, but that he was scared of it. Finally, S.M. said Father took him to a hotel room at an unknown time where they met a man named Gonzalo who was laughing at him and touching him. The officer said S.M. started crying after making this statement and did not elaborate.

S.M. and M.M. were drug tested the next day. S.M. tested positive for Clonidine, and M.M. was positive for Clonidine and methamphetamine. Neither child had a prescription for Clonidine.

The Agency gathered information from the family. Father denied the sexual allegations and asserted that Mother was putting them in the

10

children's minds. He said they did hang out with a paternal aunt and her friend, Gonzalo, once but that Gonzalo never touched S.M. Both parents accused each other of using methamphetamine. Mother admitted scratching Father and hitting him with a glass bottle, although this time she said it was on the head.

S.M. reported during a forensic interview that Father hit him and, after pulling M.M.'s pants down, hit M.M. on the buttocks. He also conveyed that he did not like when paternal grandmother dried him because he could see in her eyes that she wanted to rape him. When asked what happened when he went to bed, S.M. said he did not want to talk about it. The interviewer asked what Father did that scared him, and S.M. said he did not want to talk about it because it was scary and begged the interviewer not to send him to foster care. He mentioned the hotel incident and indicated that he did not like when Gonzalo touched his feet.

L.M. reported that Father yelled at S.M. not to lie during the January 2 altercation. She added, "My dad also touched my privates, long time ago. I already told my social worker Melissa and my dad was not supposed to be in the home, but he was nice sometimes but then he was not and he hurt my mom." G.H. said Father had been in the home for about three days.

On January 10, 2025, G.H., now 10 years old, underwent a forensic interview. She reported multiple incidents that began about two years prior when they visited Father in his trailer. She said, "He touched [S.M.] first and me second. He made me and [S.M.] touch each other." Specifically, she explained that Father made her touch her brother's "private/balls" with her hand and told S.M. "[l]et her do it or I'm going to kill. . . ." She said he also threatened to kill her, Mother, and S.M. if she did not do it, and she recounted that his private "felt like a ball and it was wet." G.H. said Father

11

laughed at them while they did it and called them "[s]tupid ass kids." She reported Father also pulled down his pants and made them both touch him. On another occasion, she said Father took S.M. into the bathroom and she heard S.M. crying and Father threatening him. The last incident involved Father taking her into the bathroom and having "sex" with her. When asked what she meant by having sex, G.H. explained that Father put his penis in her mouth and rubbed it all over her. She described it as feeling round and wet and tasting like a substance. She said he also touched her bust and vaginal area with his hands and that the touching made her vaginal area and back hurt. According to G.H., S.M. told her Father also had sex with M.M. She said Father also made her and S.M. watch him have sex with prostitutes and his attorney, and she described the women's appearance. At some point, she claimed Father got into her room through her window. G.H. ended by expressing fear about going to foster care and being sexually assaulted there.

On January 6, the court granted a temporary restraining order protecting Mother and the children. The Agency subsequently learned Mother had tested positive for methamphetamines on January 3. Social workers removed the children from Mother's care on January 10.

### E.     Petitions as to all Four Children

The Agency filed an amended petition for L.M. and new petitions for her siblings, alleging under section 300, subdivisions (b) that all four children were exposed to violent confrontations between the parents and that Mother's untreated substance abuse placed the children at substantial risk of serious physical harm. It later added to M.M.'s petition that he tested positive for methamphetamines on January 3, 2025. The petition for G.H. contained a subdivision (d) allegation detailing her sexual abuse allegations against

12

Father. The Agency originally included a sexual abuse allegation as to S.M. as well but dismissed it at the beginning of the March 19, 2025 proceeding.

### F. Evidence Supporting Jurisdiction and Disposition

During several subsequent visits with the children at Polinski Children's Center (Polinski), the children told social worker Sanchez they did not want to visit Father. G.H. understood that she was at Polinski because there was something dangerous at her house—her dad. L.M. explained that she was at Polinski because "[her] dad touched [her] a long time ago."

Mother acknowledged during an interview in January 2025 that she started using methamphetamine in December 2024 because "[t]he Ritalin wasn't cutting it." With regard to the sexual allegations, she reported that G.H. told her Father would put her in the trailer closet and pull his clothes down and also that Father sexually abused her in December 2024 when he drove her to a dentist appointment. A social worker had observed G.H. and Father leaving alone together that day.

The social worker did not receive a response from Father and was not able to interview him about the new allegations.

During a subsequent forensic interview, G.H. clarified that when she previously mentioned Father having sex with his attorney and strippers, she meant "mouth all over" and was referring to kissing with a tongue and kissing a woman's chest area. She reported multiple instances when Father climbed in their window, threatened her and S.M. not to tell, and hid in the attic.

The forensic interviewer opined that G.H. and L.M. were not coached. She said when a child is coached, the information is very limited to what someone did, and no further details are given. She noted that L.M. was clear on what occurred and volunteered information on her own. G.H., being older,

13

had more communication skills and provided details such as location, people present, and things that were around, suggesting she likely was not coached. S.M.'s interviewer indicated she could not provide an opinion.

In February, Mother alleged that a staff member at Polinski inappropriately let S.M. use his cell phone. S.M. and the visitation monitor contradicted her view of events. Neither Mother nor the Agency expressed concerns about G.H. and L.M., who both reported feeling safe at Polinski and said they did not want to visit with Father.

Sanchez met with Father who admitted he bit Mother. She expressed concern about his lack of drug testing and engagement in services. He asked about visits, and she explained that the children had declined to see him. Father said he would not do anything, including drug test, until he got his visits.

Counsel for L.M. and Father provided the court with L.M.'s stipulated testimony. Therein, L.M. stated that she did not feel like living with her dad "[b]ecause him was touching me. My private parts" (pointing to "her crotch"). She said he did not touch her anywhere else, it did not hurt, and he only touched her one time. L.M. testified that Father pushed her into the bathroom and touched her there while the rest of the family was taking care of M.M.'s bloody nose in another room. According to L.M., no one told her to say these things, and she only disclosed the touching to Mother.

In a subsequent meeting, Sanchez explained to Father that even though he did not agree with the sexual abuse allegations, he could participate in substance use treatment, drug testing, and parenting classes. Father agreed to a drug test, but not a hair follicle test, and requested a therapy referral. He did not appear for the drug test. Separately, the paternal relatives reported that the allegations against Father began after

14

they told Mother she could not keep the paternal grandparents' home. They also requested the children undergo hair follicle tests because they believed Mother drugged them. The family stated that Father was feeling depressed and hopeless, which is why he had not been responding to the Agency.

### G. Jurisdictional and Dispositional Hearing Regarding L.M.

At the March 10 hearing, counsel for the Agency stressed that, although *Mother* alleged numerous times that L.M. recanted, made excuses for potential exposures through YouTube videos and a sibling's iPad, and exerted pressure on L.M. so that Father could return home, *L.M.* never recanted when speaking to social workers, medical professionals, or law enforcement.[3] To the contrary, L.M. continued to spontaneously mention the sexual abuse on her own. The Agency acknowledged that L.M.'s statements about where the abuse occurred and what her family was doing at the time have varied but argued that she was consistent in saying that Father touched her privates and that no one told her to make that allegation. Given that she was only six years old, counsel argued it was reasonable for L.M. to confuse some of the details of something that happened over seven months before her stipulated testimony occurred.

As to the section 300, subdivision (b) allegation, the Agency pointed out that the children witnessed the September 2024 incident when Father punched Mother in the face, and that the parents admitted the description of the January 2025 domestic violence incident when Mother struck Father with a bottle and Father bit Mother's finger. It also highlighted that both parents tested positive for methamphetamine and admitted to using methamphetamine and alcohol.

---

[3] Counsel also pointed out that Mother never provided any evidence of the videos or apps, and that G.H. denied every watching such things.

Father's attorney argued Mother coached the children to make these allegations against Father and that L.M. kept changing the facts because she was having trouble keeping the story she had been fed straight. Counsel requested that the court dismiss the subdivision (d) count because the Agency had failed to meet its burden of proof. Alternatively, she asked the court to amend the allegation to conform to proof by striking everything except the allegation that he "touched the child's genital area." Counsel also objected to the first component of the case plan under the service objective entitled "do not sexually abuse your children," which required Father to understand how his actions placed the children at risk, arguing this required Father to admit sexual abuse, which he vehemently denied. She submitted that the law does not require a parent to admit to a crime.

L.M.'s counsel echoed the Agency's arguments and pointed out that L.M.'s basic claim stayed the same even though her siblings said they did not believe her and the paternal grandmother tried to hit her and called her a liar and a dirty little girl.

The court asked if Mother adamantly requesting a physical examination indicated she was concerned about the allegations. The Agency responded that Mother and Father's use of the physical exam appeared more geared toward attempting to exonerate Father, even though medical professionals had told them an examination would neither prove nor disprove sexual assault. The court also expressed its concern about all the inconsistencies regarding L.M. In response, the Agency pointed out that the siblings disclosed abuse as well and that even when L.M. was very conflicted and wanted Father back in the home, she still confirmed the allegations.

Ultimately, the court found by a preponderance of the evidence that the subdivision (b) and (d) allegations were true. What "tipped the scales for the

16

court" were L.M.'s consistent statements that this had happened even after her relatives and siblings called her a liar. The court did, however, amend the petition to conform to proof by striking the language indicating Father touched L.M.'s "buttocks with his hand while she was lying in bed causing her to have pain in her genital area." As amended, the petition alleged Father "touched the child's genital area." The court found the case plan appropriate as initially proposed.

## H. Jurisdictional and Dispositional Hearing for G.H.

At the March 19 hearing, Agency counsel restated the evidence supporting the domestic violence and substance abuse allegations. She then highlighted that G.H.'s sexual abuse disclosures during her forensic interviews were very graphic and detailed. While acknowledging that G.H. recanted her prior accusations and previously denied abuse, Agency counsel pointed out that her delay and recantation could be explained by her statements that Father threatened to kill her and Mother if she told Mother about the abuse. Counsel further emphasized that the forensic interviewer opined that G.H. had not been coached.

As to the sexual abuse count, Father's attorney pointed out that G.H. denied that anyone touched her private parts on January 3, 2025, just seven days before making her January 10 allegations. Counsel also questioned G.H.'s perception of reality, assuring the court that, contrary to G.H.'s claim, she did not have sex with Father in front of G.H. and found it very unlikely any other attorney did so. Should the court sustain the petition, counsel again asked that the court strike the requirement in the case plan that required Father to admit sexual abuse. Counsel argued Father could not be forced to choose between incriminating himself and pursuing reunification. Father further requested that any requirement of taking sexual abuse or

17

domestic violence classes be stricken from his case plan, submitting that at the very least, he should be in the victim's domestic violence class.

The court asked what it should make of the fact that the subdivision (d) count for G.H. included allegations that S.M. was involved in some of the acts when the subdivision (d) count had been stricken for S.M. The Agency responded that the case was very complicated and, while there was a lot of information that could have been pled, it believed sufficient evidence supported a subdivision (d) jurisdictional finding as to G.H.

In response to Father's concerns about admitting abuse, the Agency proposed adding "court-ordered therapy" to the challenged case plan requirement so that his statements in therapy would be given statutory immunity, and no explicit admission would be required.

The court sustained jurisdiction as to all three children under subdivision (b) and as to G.H. under subdivision (d). The court granted the request to modify the case plan.

## II. DISCUSSION

Father argues insufficient evidence supports the juvenile court's jurisdictional finding under section 300, subdivision (d) for L.M. and G.H.[4]

---

[4] Father's notices of appeal included claims he has not pursued on appeal. Specifically, he appealed from the court's March 10 denial of his request to modify the case plan and the March 19 order as applied to M.M. Because Father does not raise arguments regarding the case plan or M.M. in his opening brief, these issues are forfeited on appeal. (See *People v. Freetown Holdings Co.* (2024) 100 Cal.App.5th 1195, 1218; *Tisher v. California Horse Racing Bd.* (1991) 231 Cal.App.3d 349, 361.)

Additionally, Father argues in his opening brief that insufficient evidence supports the juvenile court's jurisdictional finding under section 300, subdivision (d) as to S.M. But because the court ultimately dismissed the section 300, subdivision (d) allegation as to S.M., this portion of the appeal challenging the March 19 order is not justiciable. Accordingly, we need not further address this claim.

18

The Agency contends that Father's appeals are not justiciable because they do not challenge the court's jurisdictional findings under section 300, subdivision (b), which independently provides a basis for jurisdiction over the children.

## A.    Justiciability

"As a general rule, a single jurisdictional finding supported by substantial evidence is sufficient to support jurisdiction and render moot a challenge to the other findings."  (*In re M.W.* (2015) 238 Cal.App.4th 1444, 1452.)  This is because the primary concern of dependency proceedings is "the protection of [the] children."  (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491 (*I.A.*).)

Appellate courts only entertain appeals presenting justiciable issues or those that "concern a present, concrete, and genuine dispute as to which the court can grant effective relief."  (*I.A., supra*, 201 Cal.App.4th at p. 1489.)  Courts do not " ' "give opinions upon moot questions or abstract propositions" ' " because when a case is moot, the court cannot grant effective relief.  (*In re D.P.* (2023) 14 Cal.5th 266, 276.)  For relief to be effective, "the plaintiff must complain of an ongoing harm" and "the harm must be redressable or capable of being rectified by the outcome the plaintiff seeks."  (*Ibid.*)  In the dependency context, a juvenile court's finding may result in ongoing harm where it continues to affect a parent's legal status, such as by limiting the parent's right to custody or visitation, or results in dispositional orders that otherwise adversely affect the parent going forward.  (*Id.* at pp. 276–278.)  Complaints that the jurisdictional finding resulted in stigma, without more, are not sufficient to sustain an appeal.  (*Id.* at p. 277.)

In this case, the unchallenged jurisdictional findings as to Father under section 300, subdivision (b) will continue to support dependency jurisdiction

19

over L.M. and G.H. regardless of the outcome of these appeals. Nevertheless, Father contends this does not moot his appeals because the challenged jurisdictional finding regarding sexual abuse affected the dispositional orders. Specifically, he asserts he was directly and adversely impacted by the subdivision (d) findings because the children were removed from his custody, his visitation is supervised, and he was ordered to engage in sexual abuse treatment that will require him to accept responsibility for conduct he denies as a measure of his case plan progress. He further contends the finding that he sexually abused his children may foreseeably have severe and unfair consequences on future visitation and custody orders in "family law [or] dependency proceedings."

The court did not draw a distinction between the subdivision (b) and (d) allegations in ordering removal of the children from Father's custody and supervised visitation. Thus, it is not clear that reversing the subdivision (d) findings would have any immediate impact on custody and visitation issues. But the court also ordered Father to comply with his case plan, which requires him to participate in a sexual abuse offenders' group. The plan further obliges Father to "understand how his [sexual abuse-related] actions place the children in the home at risk and understand how these actions may cause secondary trauma to his children."[5]

---

[5] For his case plan pertaining to G.H. only, the court modified this language to specify that "in court-ordered treatment," Father will understand how his actions place the children in the home at risk and understand how these actions may cause secondary trauma to his children. This addition responded to Father's concerns about having to admit to sexually abusing his children to progress in his case plan. It affords the protection of section 355.1, subdivision (f), which provides that "[t]estimony by a parent, guardian, or other person who has the care or custody of the minor made the subject of a proceeding under Section 300 shall not be admissible as evidence in any other action or proceeding."

20

We conclude these dispositional orders will adversely affect Father such that the appeals are justiciable.  The offenders' group requires a significant amount of time and, because the court did not modify Father's case plan as to L.M., it is possible he will be required to admit sexually abusing L.M. to avoid losing custody for failure to comply with his case plan.  Notably, our high court found a case challenging a jurisdictional finding that the father molested his child not moot even after the court permitted the father to return home and dismissed the dependency proceedings.  (See *In re I.C.* (2018) 4 Cal.5th 869, 884 (*I.C.*).)  For these reasons, we conclude a favorable ruling would provide effective relief.

## B.    Sufficiency of the Evidence

A parent may seek review of both the jurisdictional and dispositional findings on an appeal from the dispositional order.  (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249.)  The burden of proof for jurisdictional findings is preponderance of the evidence (§ 355, subd. (a)); for removal, it is clear and convincing evidence.  (§ 361, subd. (c); *Cynthia D.*, at p. 248.)  We review the juvenile court's jurisdictional and dispositional orders for substantial evidence.  (*In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).)  When applying the substantial evidence standard of review, we make all reasonable inferences from the evidence and assess whether the facts are sufficient to uphold the dependency court's findings and orders.  (*Ibid*.)  We review the record in the light most favorable to the court's decisions and do not reweigh the evidence or make independent judgments.  (*Ibid.*)

### 1.    L.M.

As a threshold matter, Father argues L.M.'s statements that he touched her privates, without any further contextual detail, do not support a finding of sexual abuse sufficient to support jurisdiction.  A child comes

within the jurisdiction of the juvenile court if "[t]he child has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by the child's parent." (§ 300, subd. (d).)  Penal Code section 11165.1's definition of sexual abuse incorporates sexual assault, which includes, but is not limited to, the intentional touching of a child's genitals "for purposes of sexual arousal or gratification." (*Id.*, subds. (a), (b)(4).)  Father contends L.M.'s statements do not support a reasonable inference that Father intentionally touched her genital area for sexual arousal.

Father forfeited this argument by not objecting on this basis during the jurisdictional hearing.  (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293 ["a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court" and "[d]ependency matters are not exempt from this rule"]); *In re S.F.* (2023) 91 Cal.App.5th 696, 724–725 (*S.F.*).)  Furthermore, absent evidence of any other explanation such as that the touch was inadvertent, it is reasonable to infer from L.M.'s assertion that Father touched her genital area that the touching was for sexual arousal.

In addressing the sufficiency of L.M.'s statements of sexual abuse as the sole basis supporting the jurisdictional finding, Father contends this case is analogous to *I.C.*, *supra,* 4 Cal.5th 869, in which our high court found a three-year-old's hearsay statements insufficient to support the jurisdictional finding.  I.C.'s mother had found her in bed with an eight-year-old neighbor boy named Oscar.  (*Id.* at p. 877.)  When she asked what was going on, I.C. said they were kissing.  (*Ibid.*)  Her five-year-old brother started crying and added that Oscar "put a train in her." (*Ibid.*)  A social services report

indicates Oscar also " 'stuck his penis into [I.C.'s] vagina.' " (*Ibid.*)  A subsequent child protective services investigation was inconclusive.  (*Id.* at p. 878.)  Meanwhile, the mother explained that she had many discussions with I.C. after the incident about " 'good touches and bad touches' " and used the words " 'penis' " and " 'vagina' " during those talks.  (*Ibid.*)

Two months later, I.C. spontaneously said to her mother, " 'My dad put his penis on me.' " (*I.C., supra*, 4 Cal.5th at p. 878.)  Her brother corrected her, saying it was Oscar who did that to her, but I.C. kept repeating the allegation.  (*Ibid.*)  The next morning, she told her mother she was " 'just kidding.' " (*Ibid.*)  A child welfare worker spoke to I.C. at preschool and noted that I.C. was not able to tell the difference between the truth and a lie. (*Ibid.*)  Nonetheless, the worker recorded I.C.'s claim that her father touched her vagina with his penis in her brother's room.  (*Ibid.*)  During a forensic interview, I.C. said her father had put his penis, then a train and a flower on her five times and pointed to her vagina.  (*Id.* at p. 879.)  She also said he did it to the father's 21-year-old daughter from a previous marriage, and that she, her babysitter, and her babysitter's sister were there.  (*Id.* at p. 880.) The older daughter denied this ever occurred.  (*Id.* at p. 881.)

The juvenile court asserted jurisdiction, and the appellate court affirmed.  (*I.C., supra*, 4 Cal.5th at pp. 881, 883.)  In reversing, our high court expressed concern that the case was an "unusual situation" in which the child was previously molested and then made "strikingly similar" allegations against her father.  (*Id.* at p. 896.)  It cited the plurality's reasoning in *In re Lucero L.* (2000) 22 Cal.4th 1227 (*Lucero*) that " 'relying too heavily on the hearsay statements of incompetent minors to make jurisdictional findings when there has been no opportunity for cross-examining the minor' [citation]—and, in particular, when the minor 'has been determined to be

23

incompetent to distinguish between truth and falsehood' [citation]—raises a substantial risk of erroneously depriving parents of their substantial interest in maintaining custody of their children." (*I.C., supra*, at p. 887.) For this reason, the court agreed with *Lucero* that "due process requires a showing that ' "the time, content and circumstances of the statement provide sufficient indicia of reliability" ' before a juvenile court may rely exclusively on such a statement in making its jurisdictional findings." (*Ibid.*) It confirmed that, in assessing the reliability of the child's statements, the court may consider factors including: " '(1) spontaneity and consistent repetition; (2) the mental state of the declarant; (3) use of terminology unexpected of a child of a similar age; and (4) lack of motive to fabricate.' " (*Id.* at p. 891.) The court may also consider whether the child is truth competent and any other factor bearing on reliability. (*Ibid.*)

Because the juvenile court failed to take adequate account of the prior molestation, the mother's discussions with I.C. using the words "penis" and "vagina," and I.C.'s demonstrated "tendency to interweave fantasy with truth," our high court determined that the spontaneity and details of I.C.'s allegations were less compelling than they otherwise would have been. (*I.C., supra*, 4 Cal. 5th at pp. 892–894.) Accordingly, the *I.C.* court concluded the child's statements were not sufficiently reliable to support the jurisdictional finding. (*Id.* at p. 896.)

Here, three initial factors alleviate some of the due process concerns that were relevant in *I.C.* First, counsel for L.M. demonstrated L.M.'s ability to distinguish between the truth and a lie, at least at the time she gave her stipulated testimony, and Father does not challenge this fact. Second, Father's counsel had an opportunity to ask L.M. questions during this testimony. Finally, while there was no direct evidence corroborating I.C.'s

24

allegations against Father, the fact that G.H. and S.M. subsequently disclosed sexual abuse by Father corroborates L.M.'s claim.[6]

In otherwise contending L.M.'s story is unreliable, Father focuses heavily on statements made by Mother, and argues the court glossed over these discrepancies. However, during the hearing, the Agency highlighted all the reasons for questioning Mother's credibility. In response, the court observed that the Agency was arguing that the only credible person was L.M. It was for this reason that the court focused primarily on allegations made by L.M. to individuals other than Mother. Notably, Father acknowledges in his opening brief that Mother was an unreliable reporter.

Substantial evidence in the record supports a conclusion that Mother lacked credibility. She changed her stories when she wanted to reunite with Father and claimed without any proof that the children learned sexual information from videos and cartoons. None of the children ever said they observed sexual content online, and Mother never showed any of the digital content to the Agency even though she claimed to have taken the iPad away from the children. Her ex-husband also explained that she made false accusations against him and his brother. Accordingly, in evaluating the reliability of L.M.'s statements, we focus on statements she and her siblings made directly to social workers, forensic interviewers, and law enforcement, as opposed to Mother's various reports of L.M.'s statements.

On July 16, 2024, the day after L.M. first reported the touching to Mother, L.M. told an officer Father had touched her "privates" with his hand

---

[6] Although the *Lucero* court acknowledged that " 'corroboration is an additional safeguard against the possibility of fabrication by very young witnesses whose out-of-court statements are insulated from the rigors of cross-examination,' " it concluded corroboration is not mandated by due process. (*Lucero, supra*, 22 Cal.4th at pp. 1248–1249.)

one time, on her mom's bed, and that it "hurt me." She then told a social worker that Father touched her vagina and placed her hand on her vagina to indicate. G.H. and S.M. both confirmed L.M. had told them Father touched her privates. G.H. also said she believed L.M. lied and that the paternal grandmother called L.M. a "dirty little girl" and tried to hit L.M.

Three days later, L.M. informed a forensic interviewer that she had told Mother that Father touched her privates while she was on Mother's bed. She pointed to her genital and buttocks areas and added, "I hate him when he touch my private." She again only claimed it occurred one time and expressed that it made her sad that her siblings did not believe her. According to L.M., G.H. was asleep in the same room and Mother was at the store.

The only time L.M. directly denied abuse was on September 24, when she told Sanchez she wanted Father to move back into the house. This was after G.H. and S.M. first alleged Father molested them. Mother told a social worker the children recanted and then all three children denied abuse when speaking with Sanchez. L.M. denied ever viewing videos or pictures of private parts.

On November 1, 2024, L.M. told Sanchez she did not lie and said "only [her] dad" touched her private parts. She reported it was "a long time ago," that it happened "a lot of times," and that "[she] didn't like it." Nonetheless, she said she loved her dad and wanted to continue visiting him.

On January 3, 2025, while discussing Father biting Mother's hand and G.H. and S.M.'s new sexual abuse allegations, L.M. said Father was yelling at S.M. not to lie by saying Father touched his privates. She then volunteered: "My dad also touched my privates, long time ago. I already told

my social worker Melissa and my dad was not supposed to be in the home, but he was nice sometimes but then he was not and he hurt my mom."

On February 3, L.M. explained that she was at Polinski because "[her] dad touched [her] a long time ago." She said she did not want visits with him because of the touching.

Finally, on February 11, 2025, L.M. said in her stipulated testimony in response to Father's counsel's questioning that Father touched her private parts (pointing to her genital area), that he only touched her once with his hands, and that it did not hurt. She denied that he touched her anywhere else and said she only told Mother. This time, she told counsel Father pushed her into the bathroom and that Mother and her siblings were helping Max with his bloody nose in a different room. She denied that anyone told her what to say that day or at any time regarding Father touching her privates.

The juvenile court could reasonably conclude that this evidence demonstrating that L.M. told professionals on *seven* different occasions that Father touched her privates, in addition to telling her siblings and Mother, was consistent and supported asserting jurisdiction by a preponderance of the evidence. Additionally, on at least one of these occasions, L.M. appears to have spontaneously volunteered information about the abuse when a social worker was inquiring about something else. Moreover, although Father claims she was coached by Mother to say these things, the forensic interviewer opined there was no indication she had been coached, and L.M. said no one ever told her what to say.

Particularly given that L.M. was only five years old when the incident occurred, it also was reasonable for the court to be persuaded by the fact that L.M. repeated the allegation even though her siblings and relatives accused

27

her of lying and even though that made her feel sad.[7]  L.M. understood that Father was not allowed in the house because of her allegations, and she said she still loved him.  As such, any motivation she had to lie would have favored recanting.  Although L.M. denied abuse one time, it notably was the same day when both of her siblings also recanted.  The Agency explained that "it is common for children to recant sexual abuse allegations due to fear, shame, and confusion."  But, at all other times, she continued to assert that he touched her and that she did not like it.

There is no doubt L.M. made differing statements about the circumstances surrounding the touching.  However, in the two interviews closest in time to the event, L.M. told essentially the same story of it happening on Mother's bed, one time.  She only said it hurt the first time, but she was not asked that question the second time.  The one instance where she said it happened multiple times, she described it as having happened "a long time ago."  But four months is a long time in the lifespan of a young child.  In weighing L.M.'s credibility, the court reasonably noted her age and the timing of her statements, and we may not reweigh the evidence on appeal. (*I.J., supra*, 56 Cal.4th at p. 773 [confirming that evidence need not be uncontradicted to constitute substantial evidence supporting the jurisdictional finding].)  For the same reason, the court could reasonably discount the variance in L.M.'s stipulated testimony taken seven months later when assessing L.M.'s overall credibility.  Her testimony that Father touched her in the bathroom does appear to incorporate facts from her siblings' disclosures.  And although L.M. testified she did not tell her siblings

---

7    Notably, G.H. did not state that L.M. had told her otherwise—G.H. only expressed her view at the time that "[m]y dad wouldn't do that."  She then subsequently alleged abuse herself.

after having earlier reported that she did, she consistently asserted they thought she lied, suggesting they did discuss the touching.[8]

Ultimately, on this record, we conclude there is substantial evidence to support jurisdiction over L.M. under section 300, subdivision (d).

### 2. G.H.

Because G.H. was 10 years old when she described Father's abuse, the forensic interviewer did not ask questions to assess whether she could tell the difference between the truth and a lie, as she had with L.M. Given the lack of doubt that G.H. was truth competent, there is less of a due process concern about relying on her hearsay statements from the Agency reports, absent a showing of additional indicia of reliability. (C.f., *I.C., supra*, 4 Cal. 5th at p. 887 [explaining the *Lucero* plurality conclusion that "[e]ven though the hearsay statements of a *truth incompetent* child, contained in a social study, are admissible, . . . they 'may not be relied on solely as a basis for a jurisdictional finding unless the court finds that they show special indicia of reliability.'" (Italics added)].) Nonetheless, such indicia exist. G.H. described the incidents in great detail, recounting such things as how her brother's privates felt, the taste of oral copulation, her Father's specific comments and threats, and the race of the prostitutes. According to the forensic interviewer, this level of detail indicated it was less likely she was coached. To the extent Father contends G.H. has not consistently claimed abuse, she explained that she did not disclose Father's sexual abuse earlier because he repeatedly threatened to kill her and her family if she told anyone. And when given the opportunity to say no, she consistently declined

---

8    And again, both G.H. and S.M. said L.M. told them that Father touched her.

visits with Father, describing him as "dangerous." These facts provide substantial evidence supporting the court's jurisdictional finding.

Father argues the forensic interviewer's conclusions are not evidence of G.H.'s veracity, and we agree that to the extent the record suggests she opined G.H. could not have lied, the expert interviewer should not have offered an opinion on whether G.H. was telling the truth. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82 [determinations of truthfulness and credibility are left to the trier of fact].) But the court was entitled to consider her opinion that coached statements generally lack detail in making its own credibility determination. To the extent Father further challenges the forensic interviewer's purported statement, as summarized by a social worker, on the grounds that it implies G.H. could not be coached or was telling the truth *because* she has a speech and learning disability, we observe that Father did not object to the court admitting the Agency's report or request to cross-examine the social worker. He therefore forfeited this challenge on appeal. (See *S.F., supra,* 91 Cal.App.5th at p. 724.)[9]

Father further contends that, as in *I.C.*, special circumstances make her disclosures less compelling. We are not persuaded that these conditions undermine the substantial evidence supporting the finding. Father points out that G.H. was exposed for months to both her sister's sexual abuse claims and suggestive questions as to whether anyone touched her privates. But

---

[9]  It also is not evident from the social worker's summary that the forensic expert actually linked G.H.'s veracity to her disability. The social worker may simply have recorded what she recalled from the conversation when she wrote: "She [forensic interviewer] also reported that she had learned that [G.H.] (10) had an IEP for speech and a learning disability and that she believed that [G.H.] (10) could not be coached." The forensic interviewer's actual report does not link the two, nor does the social worker's lengthier summary. Also, neither states that G.H. "could not" be coached. Rather, they said she likely had not been.

any claim that these circumstances inspired an elaborate lie is merely speculative. The same is true of Father's contention that Mother saying in a restraining order application that Father wanted to kill her may have influenced G.H.'s claim that Father threatened to kill her. There is no evidence G.H. ever saw the application. Nor is there evidence of Father's contention that G.H. knew that Mother accused Father of infidelity with his attorney and was inspired by this information to accuse Father of having sex with his attorney. Finally, Father asserts that G.H. viewed pornographic videos, but only Mother ever made this allegation. G.H. and L.M. denied it, and Mother never produced the children's internet search history or the videos.

To the extent Father otherwise challenges the credibility of G.H.'s statements in the reports and S.M.'s lack of corroboration, these were issues the court specifically probed with counsel before making its determination. We will not disturb the juvenile court's credibility determinations on appeal. (*I.J., supra*, 56 Cal.4th at p. 773.)

Accordingly, we conclude substantial evidence supported the court's jurisdictional finding under section 300, subdivision (d) as to G.H. Because Father challenged the dispositional orders only to the extent they were based on the jurisdictional finding, we need not further address his appeals of these orders.

31

### III.   DISPOSITION

The juvenile court's March 10, 2025, and March 19, 2025, jurisdictional findings and dispositional orders are affirmed.


                                                      KELETY, J.

WE CONCUR:


O'ROURKE, Acting P. J.


RUBIN, J.